# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY
# TRENTON VICINAGE

|  |  |
|---|---|
| **The Doris Behr 2012 Irrevocable Trust**, | |
| Plaintiff, | Case No. 3:19-cv-8828-MAS-LHG |
| v. | |
| **Johnson & Johnson**, | |
| Defendant. | |

## BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

JONATHAN F. MITCHELL*
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

WALTER S. ZIMOLONG
Zimolong LLC
P.O. Box 552
Villanova, Pennsylvania 19085
(215) 665-0842
wally@zimolonglaw.com

HAL S. SCOTT*
Harvard Law School
1557 Massachusetts Avenue
Cambridge, Massachusetts 02138
(617) 495-4590
hscott@law.harvard.edu

* admitted *pro hac vice*

*Counsel for Plaintiff*

# TABLE OF CONTENTS

Table of contents ....................................................................................... i

Table of authorities ................................................................................. iii

I.  The trust's proposal will not cause Johnson & Johnson to violate the law of New Jersey .......................................................................... 1

    A. The New Jersey Business Corporation Act allows bylaws to regulate any matter related to a corporation's "affairs," its "business," or the "rights or power of its shareholders" ................................ 1

        1. The proposed shareholder-arbitration bylaw is authorized by section 14A:3-1(1)(k) because it regulates "the affairs of the corporation" ....................................................................... 2

        2. The proposed shareholder-arbitration bylaw is authorized by section 14A:2-9(4) because it relates to "the business of the corporation" ....................................................................... 3

        3. The proposed shareholder-arbitration bylaw is authorized by section 14A:2-9(4) because it relates to "the conduct of" Johnson & Johnson's "affairs" ........................................... 4

        4. The proposed shareholder-arbitration bylaw is authorized by section 14a:2-9(4) because it relates to "the rights or power" of Johnson & Johnson, its shareholders, its directors, and its officers ....... 4

    B. Johnson & Johnson fails to identify any New Jersey statute, court decision, or judicial doctrine that prohibits corporations from adopting shareholder-arbitration bylaws ................................ 6

        1. Johnson & Johnson fails to identify any New Jersey statute that prohibits corporations from adopting shareholder-arbitration bylaws ...................................................................... 7

        2. Johnson & Johnson fails to identify any New Jersey court decision or judicial doctrine that prohibits corporations from adopting shareholder-arbitration bylaws ........................... 13

        3. Nothing in the law of New Jersey indicates that the proposed shareholder-arbitration bylaw regulates "external" rather than "internal" matters ............................................................ 17

II. Johnson & Johnson cannot manufacture a prohibition in New Jersey law by relying on the Delaware Chancery Court's decision in *Sciabacucchi* ........ 18

    A. Johnson & Johnson, as a New Jersey Corporation, is not "subject" to Delaware Statutes or judicial decisions ................................................. 18

    B. Nothing in Delaware Law would prevent Johnson & Johnson from adopting the proposed shareholder-arbitration bylaw ............................ 22

III. The Federal Arbitration Act will preempt any state law that prevents courts from enforcing the proposed shareholder-arbitration bylaw ............. 28

IV. The state Attorney General's edicts are not entitled to deference ............... 34

V. The trust's proposal will not cause Johnson & Johnson to violate federal law ........................................................................................................... 37

VI. The trust has standing ............................................................................. 40

Conclusion ...................................................................................................... 40

Certificate of service ....................................................................................... 42

# TABLE OF AUTHORITIES

## Cases

*Airgas, Inc. v. Air Prods. and Chems., Inc.*, 8 A.3d 1182 (Del. 2010)........................29

*Asarco Inc. v. Court*, 611 F. Supp. 468 (D.N.J. 1985) ...............................................19

*AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011) ................................. passim

*ATP Tour, Inc. v. Deutscher Tennis Bund*, 91 A.3d 554 (Del. 2014) ............. 24, 25, 27

*Balsamides v. Protameen Chemicals, Inc.*, 734 A.2d 721 (N.J. 1999)..........................19

*Blair v. Scott Specialty Gases*, 283 F.3d 595 (3d Cir. 2002) .....................................29

*Boilermakers Local 154 Ret. Fund v. Chevron Corp.*,
   73 A.3d 934 (Del. Ch. 2013)....................................................................20, 22, 23

*Brown v. Brown*, 731 A.2d 1212 (N.J. Super. 1999) .................................................19

*Casey v. Brennan*, 780 A.2d 553 (N.J. Super. 2001) ................................................19

*Centaur Partners, IV v. Nat'l Intergroup, Inc.*, 582 A.2d 923 (Del. 1990) ...............29

*Corvex Management LP v. CommonWealth REIT*, No. 24-C-13-001111,
   2013 WL 1915769 (Cir. Ct. Balt. City May 8, 2013)..............................................30

*Delaware County Employees Retirement Fund v. Portnoy*,
   No. 13-10405-DJC, 2014 WL 1271528 (D. Mass. Mar. 26, 2014) .......................30

*Edgar v. MITE Corp.*, 457 U.S. 624 (1982)...............................................................13

*Epic Systems Corp. v. Lewis*, 138 S. Ct. 1612 (2018) ........................................ 21, 38

*Fagin v. Gilmartin,* 432 F.3d 276 (3d Cir. 2005) ............................................... 14, 19

*Francis v. United Jersey Bank*, 432 A.2d 814 (N.J. 1981) ........................................ 20

*Gen. Elec. Co. by Levit v. Cathcart*, 980 F.2d 927 (3d Cir. 1992)..............................12

*In re Newark Watershed Conservation & Development Corp.*, 560 B.R.
   129 (Bankr. D.N.J. 2016) ......................................................................................19

*In re Wal-Mart Wage & Hour Employment Practices Litigation*, 737 F.3d
   1262 (9th Cir. 2013)..............................................................................................39

*Kindred Nursing Centers Ltd. P'ship v. Clark*, 137 S. Ct. 1421 (2017) .....................32

*Kirleis v. Dickie, McCamey & Chilcote, P.C.*,
   560 F.3d 156 (3d Cir. 2009) ..................................................................................30

*Lambert v. Fishermen's Dock Co-op, Inc.*, 297 A.2d 566 (N.J. 1972) .............. 14, 15, 16

*Lawson Mardon Wheaton v. Smith*, 734 A.2d 738 (N.J. 1999) ................................... 19

*Mayflower Sec. Co. v. Bureau of Sec. in Div. of Consumer Affairs of Dep't of Law & Pub. Safety*, 312 A.2d 497 (N.J. 1973) .................................... 37

*Metromedia, Inc. v. Dir., Div. of Taxation*, 478 A.2d 742 (N.J. 1984) ..................... 34

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614 (1985) ........................................................................ 37

*Moses H. Cone Hosp. v. Mercury Const. Corp.*, 460 U.S. 1 (1983) ........................... 28

*NCP Litigation Trust v. KMPG*, 945 A.2d 132 (N.J. Super. 2007) ......................... 20

*New Jersey Guild of Hearing Aid Dispensers v. Long*, 384 A.2d 795 (N.J. 1978)........................................................................ 35, 37

*Rent-A-Car, West, Inc. v. Jackson*, 561 U.S. 63 (2010) ............................................6

*Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477 (1989) ........................................................................ 38

*Rosenberg v. AT&T Employees Federal Credit Union*, 726 F. Supp. 573 (D.N.J. 1989) .............................................................29

*Shaev v. Saper*, 320 F.3d 373 (3d Cir. 2003)............................................................12

*Shearson/American Express Inc. v. McMahon*, 482 U.S. 220 (1987) ................... 37, 38

*South Jersey Sanitation Co., Inc. v. Applied Underwriters Captive Risk Assurance Co.*, 840 F.3d 138 (3d Cir. 2016) .........................................................6

*Stenberg v. Carhart*, 530 U.S. 914 (2000)........................................................ 35, 36

*Trinity Wall Street v. Wal-Mart Stores, Inc.*, 792 F.3d 323 (3d Cir. 2015).....................................................................1

*Vergopia v. Shaker*, 922 A.2d 1238 (N.J. 2007) ......................................................29

*Wilko v. Swan*, 346 U.S. 427 (1953) ....................................................................38

**Statutes**

9 U.S.C. § 2 ...................................................................................................... 28, 31

9 U.S.C. § 10 .........................................................................................................39

N.J. Rev. Stat. § 14A:13-22 ..................................................................................34

N.J. Stat. Ann. § 14A:3-1(1) ...................................................................... 2

N.J. Stat. Ann. § 14A:3-1(1)(k) .................................................. 2, 3, 8, 35

**Other Authorities**

Frank H. Easterbrook, *Plea Bargaining as Compromise*, 101 Yale L.J.
1969 (1992) ...........................................................................................39

Paul Weitzel, *The End of Shareholder Litigation: Using Bylaw or Charter
Amendments to Require Binding Arbitration of Shareholder Disputes*,
2013 BYU L. Rev. 65 .............................................................................29

**Rules**

Fed. R. Civ. P. 17(b)(3) ............................................................................ 40

Fed. R. Civ. P. 17(c)................................................................................. 40

Federal law compels Johnson & Johnson to include the Trust's proposal in its proxy materials—unless Johnson & Johnson shows that the proposal "would, if implemented, cause the company to violate any state, federal, or foreign law to which it is subject." 17 C.F.R. § 240.14a-8(i)(2); *see also Trinity Wall Street v. Wal-Mart Stores, Inc.*, 792 F.3d 323, 334 (3d Cir. 2015) ("[The company] bears the burden of establishing as a matter of law that it properly excluded the proposal under an exception to Rule 14a-8."). Nothing in the motion to dismiss—and nothing in the amicus briefs—comes anywhere close to establishing that Johnson & Johnson would violate the law of New Jersey (or the law of the United States) if it were to adopt a bylaw requiring arbitration of federal securities-law claims.

## I.   THE TRUST'S PROPOSAL WILL NOT CAUSE JOHNSON & JOHNSON TO VIOLATE THE LAW OF NEW JERSEY

Johnson & Johnson devotes most of its attention to the law of New Jersey, yet the text of the New Jersey Business Corporation Act confers sweeping powers on corporations to adopt bylaws—and this statutory language does not remotely suggest a prohibition on bylaws that require arbitration of federal securities-law claims.

### A.   The New Jersey Business Corporation Act Allows Bylaws To Regulate Any Matter Related To A Corporation's "Affairs," Its "Business," Or The "Rights Or Power Of Its Shareholders"

The New Jersey Business Corporation Act clearly and explicitly defines the permissible scope of a corporation's bylaws. In section 14A:3-1(1), the Act provides:

> Each corporation, subject to any limitations provided in this act or any other statute of this State, or in its certificate of incorporation, shall have power . . .

(k) to make and alter by-laws for the administration and regulation of the affairs of the corporation . . . .

N.J. Stat. Ann. § 14A:3-1(1)(k). And section 14A:2-9(4) provides:

The by-laws may contain any provision, not inconsistent with law or the certificate of incorporation, relating to the business of the corporation, the conduct of its affairs, and its rights or power or the rights or power of its shareholders, directors, officers or employees.

N.J. Stat. Ann. § 14A:2-9(4). These provisions allow bylaws to govern "the affairs of the corporation," "the business of the corporation," "the conduct of its affairs," or "the rights or power of its shareholders, directors, officers or employees."

This statutory language is an embarrassment to Johnson & Johnson, because it defines the permissible breadth of corporate bylaws in sweeping terms and contains none of the limits that Johnson & Johnson claims that New Jersey law imposes on the scope of corporate bylaws. We can begin by counting the number of ways in which the proposed shareholder-arbitration bylaw is authorized by the clear and explicit text of the New Jersey Business Corporation Act.

### 1. The Proposed Shareholder-Arbitration Bylaw Is Authorized By Section 14A:3-1(1)(k) Because It Regulates "The Affairs Of The Corporation"

The proposed shareholder-arbitration bylaw is authorized by N.J. Stat. Ann. § 14A:3-1(1)(k), because it regulates "the affairs of the corporation." *See* N.J. Stat. Ann. § 14A:3-1(1) ("Each corporation . . . shall have power . . . (k) to make and alter by-laws for the administration and regulation of the affairs of the corporation"). Neither Johnson & Johnson—nor any of its supporting amici—even attempts to deny that the proposed shareholder-arbitration bylaw regulates the corporation's "affairs." And a bylaw that requires shareholders to litigate their federal securities-law

claims in an arbitral forum unquestionably regulates "the affairs of the corporation." Johnson & Johnson or its directors and officers will be named defendants in these disputes, and the claims arise out of the relationship between the corporation and its shareholders. The resolution of these disputes is among the many "affairs" of Johnson & Johnson, and the proposed shareholder-arbitration bylaw is therefore authorized by the unambiguous text of N.J. Stat. Ann. § 14A:3-1(1)(k).

### 2. The Proposed Shareholder-Arbitration Bylaw Is Authorized By Section 14A:2-9(4) Because It Relates To "The Business Of The Corporation"

The proposed shareholder-arbitration bylaw is also authorized by N.J. Stat. Ann. § 14A:2-9(4) because it relates to "the business of the corporation." *See* N.J. Stat. Ann. § 14A:2-9(4) ("The by-laws may contain any provision, not inconsistent with law or the certificate of incorporation, relating to the business of the corporation. . .."). There is no conceivable argument that the proposed shareholder-arbitration bylaw is *unrelated* to the business of Johnson & Johnson.

Johnson & Johnson's only attempt to address this provision of section 14A:2-9(4) appears on page 20 of its brief:

> As a preeminent global healthcare company, Johnson & Johnson is in the business of providing innovative products and solutions relating to improving human health and well-being. It is not in the business of defending federal securities class actions.

J&J Br. (ECF No. 25-1) at 20. That observation does nothing to establish that the proposed bylaw is unrelated to "the business of the corporation." The statute does not limit a corporation's bylaws to the *principal* "business of the corporation"; it

authorizes bylaws that relate to *any* of the corporation's "business." Whether a corporation will have to defend federal securities-law claims in an arbitral or judicial forum is undeniably "related" to "the business of the corporation," as the outcome of these lawsuits will affect the corporation's assets and insurance policies, as well as the value of its stock. The proposed shareholder-arbitration bylaw is therefore authorized by the unambiguous language of N.J. Stat. Ann. § 14A:2-9(4).

### 3. The Proposed Shareholder-Arbitration Bylaw Is Authorized By Section 14A:2-9(4) Because It Relates To "The Conduct Of" Johnson & Johnson's "Affairs"

The proposed shareholder-arbitration bylaw is authorized by section 14A:2-9(4) for yet another reason: It relates to "the conduct of" the corporation's "affairs." *See* N.J. Stat. Ann. § 14A:2-9(4) ("The by-laws may contain any provision, not inconsistent with law or the certificate of incorporation, relating to . . . the conduct of [the corporation's] affairs"). Johnson & Johnson is "conducting" its "affairs" when it defends itself against federal securities-law claims—and a bylaw that moves these disputes into arbitral forums is "related to" the conduct of those affairs. Johnson & Johnson never denies that it is "conducting" its "affairs" in these situations, and it does not even discuss this language in section 14A:2-9(4).

### 4. The Proposed Shareholder-Arbitration Bylaw Is Authorized By Section 14A:2-9(4) Because It Relates To "The Rights Or Power" Of Johnson & Johnson, Its Shareholders, Its Directors, And Its Officers

The proposed shareholder-arbitration bylaw is authorized by section 14A:2-9(4) for a final reason: It relates to "the rights or power" of the corporation, and it relates to "the rights or power of its shareholders, directors, [or] officers." *See* N.J. Stat.

Ann. § 14A:2-9(4) ("The by-laws may contain any provision, not inconsistent with law or the certificate of incorporation, relating to . . . [the corporation's] rights or power or the rights or power of its shareholders, directors, officers or employees").

A bylaw that requires shareholders to arbitrate their federal securities-law claims relates to "the rights or power" of Johnson & Johnson, because it gives the corporation the "right" and "power" to defend those claims in an arbitral forum. The bylaw relates to "the rights or power" of its directors and officers for the same reason: Each of them is given the right and power to demand arbitration when they are sued for violating the federal securities laws. Finally, the bylaw relates to "the rights or power" of Johnson & Johnson's shareholders, because it eliminates their right and power to bring federal securities-law claims in judicial rather than arbitral forums— and it eliminates their right and power to litigate these claims on a classwide basis.

Johnson & Johnson acknowledges that the proposed bylaw will have precisely these effects. *See* J&J Br. (ECF No. 25-1) at 1 ("These bylaws would require not only mandatory arbitration of all federal securities law claims, but also waivers of class-action rights, rights to appeal and rights to challenge any arbitration award."). Yet Johnson & Johnson never explains how a bylaw of this sort can be *unrelated* to "the rights or power" of the corporation and its directors, officers, and shareholders.

The closest that Johnson & Johnson comes to addressing this provision of section 14A:2-9(4) appears in the following passage:

> Federal securities claims are rights of action created by federal law that concern the relationship between purchasers and sellers of a corporation's securities who may or may not be shareholders at the time the claims accrue. *See Sciabacucchi*, 2018 WL 6719718, at *18–22. Such

> claims concern whether federal law was followed and do not implicate the rights of "stockholders qua stockholders," because they do "not arise out of or relate to the ownership of the share, but rather from the purchase of the share." *Id.* at *11, *17.

J&J Br. (ECF No. 25-1) at 20–21. But it has long been settled that claims of fraudulent inducement to enter into a contract are to be resolved in an arbitral forum if the contract in question has a mandatory arbitration provision. *See, e.g.*, *South Jersey Sanitation Co., Inc. v. Applied Underwriters Captive Risk Assurance Co.*, 840 F.3d 138, 144–45 (3d Cir. 2016) (citing *Prima Paint Corp. v. Flood & Concklin Manufacturing Co.*, 388 U.S. 395, 396-97 (1967)); *see also Rent-A-Car, West, Inc. v. Jackson*, 561 U.S. 63, 70–72 (2010). Here, of course, the contract in question is the bylaws, and they become binding on the corporation and its shareholders when an investor purchases shares in the corporation—and they remain binding if the investor subsequently claims it was fraudulently induced to do so. And if a person is fraudulently induced to sell his shares, that person was by definition a shareholder and subject to the corporation's bylaws at the time of the sale.

In all events, the proposed bylaw undeniably affects "the rights or power" of the corporation and its directors and officers—who are given the "right" and "power" to defend themselves in an arbitral forum—independent of the bylaw's effects on shareholders. Johnson & Johnson has no answer to this.

### B. Johnson & Johnson Fails To Identify Any New Jersey Statute, Court Decision, Or Judicial Doctrine That Prohibits Corporations From Adopting Shareholder-Arbitration Bylaws

We have seen that there are four separate provisions in the New Jersey Business Corporation Act that authorize the proposed shareholder-arbitration bylaw:

1. Section 14A:3-1(1)(k), which authorizes bylaws "for the administration and regulation of the affairs of the corporation."

2. Section 14A:2-9(4), which authorizes bylaws "relating to the business of the corporation."

3. Section 14A:2-9(4), which authorizes bylaws "relating to . . . the conduct of [the corporation's] affairs."

4. Section 14A:2-9(4), which authorizes bylaws "relating to . . . [the corporation's] rights or power or the rights or power of its shareholders, directors, officers or employees."

Johnson & Johnson must refute the Trust's reliance on *each* of these statutory provisions before it can hope to demonstrate that the proposed bylaw would cause the company to "violate" the law of New Jersey. Yet Johnson & Johnson fails to identify *any* provision of New Jersey law—no statute, no court decision, and no judicial doctrine—that prohibits a corporation from adopting a shareholder-arbitration bylaw.

### 1. Johnson & Johnson Fails To Identify Any New Jersey Statute That Prohibits Corporations From Adopting Shareholder-Arbitration Bylaws

Johnson & Johnson's first move is to conjure into existence a state law that permits corporate bylaws to regulate *only* the corporation's "internal affairs," and then claim that the proposed shareholder-arbitration bylaw is unrelated to the "internal affairs" of the corporation.[1] But the New Jersey Business Corporation Act imposes no such limitation of the scope of corporate bylaws, as we have already seen:

---

1. *See* J&J Br. (ECF No. 25-1) at 14 ("New Jersey law . . . does not authorize a mandatory arbitration bylaw or any other bylaw purporting to regulate matters unrelated to the internal affairs of a corporation."); *id.* ("Litigation of federal securities claims . . . falls outside the scope of the internal affairs of the Company").

1. Section 14A:3-1(1)(k) authorizes bylaws "for the administration and regulation of the affairs of the corporation."

2. Section 14A:2-9(4) authorizes bylaws "relating to the business of the corporation."

3. Section 14A:2-9(4) authorizes bylaws "relating to . . . the conduct of [the corporation's] affairs."

4. Section 14A:2-9(4), which authorizes bylaws "relating to . . . [the corporation's] rights or power or the rights or power of its shareholders, directors, officers or employees."

*See* N.J. Stat. Ann. § 14A:3-1(1)(k); N.J. Stat. Ann. § 14A:2-9(4). Rather than confronting this statutory language, Johnson & Johnson pretends that these statutes say something other than what they actually say. Johnson & Johnson does not even acknowledge the text of section 14A:3-1(1)(k) until page 16 of its brief, and when it finally gets around to this statutory language it issues an ipse dixit proclaiming that the text "only authorizes corporations to enact bylaws regulating matters of *internal* concern." J&J Br. (ECF No. 25-1) at 16 (emphasis added). Later, Johnson & Johnson quotes again from section 14A:3-1(1)(k) and repeats its dogmatism that the statutory language is somehow limited to a corporation's "internal affairs"—rather than "the affairs of the corporation":

> Section 14A:3-1 ("Section 3-1(k)") defines the extent of corporate powers generally and provides corporations with the power "to make and alter by-laws *for the administration and regulation of the affairs of the corporation*." N.J.S.A. § 14A:3-1(k) (emphasis added). Under Section 3-1(k), a corporation is without power to adopt a bylaw that does not concern the internal affairs of the corporation.

J&J Br. (ECF No. 25-1) at 17–18. It is almost as if Johnson & Johnson thinks it can transform the statutory language through an act of sheer willpower—or that it can induce the Court to "interpret" a statute in the manner it wants by simply declaring, many times, that the text authorizes only corporate bylaws that regulate a corporation's "internal" affairs.

Johnson & Johnson displays a similar obstinacy toward section 14A:2-9(4). After quoting the statute, Johnson & Johnson insists that it authorizes only bylaws that regulate a corporation's "internal affairs"—even though the statute's language sweeps far more broadly:

> Section 14A:2-9(4) provides: "The by-laws may contain any provision, not inconsistent with law or the certificate of incorporation, *relating to the business of the corporation, the conduct of its affairs, and its rights or power or the rights or power of its shareholders, directors, officers or employees.*" N.J.S.A. § 14A:2-9(4) (emphasis added). Section 2-9(4) again reflects the uncontroversial position that bylaw provisions are limited to regulating matters concerning the "'internal affairs' of the corporation." *See* 2016 N.J. A.B. 2162, 1st Sess. at 1 (N.J. Comm. Rep. Nov. 30, 2017) (Dkt. No. 1-6 at 9) (the "Committee Report").

J&J Br. (ECF No. 25-1) at 18. There is not even a suggestion in the language of section 14A:2-9(4) that bylaws are limited to the "internal affairs" of a corporation; the statute authorizes bylaws that relate to *any* aspect of the corporation's "business" or "affairs." Then the statute goes on to authorize bylaws that relate to the "rights

or power" of the corporation, its shareholders, and its directors and officers—a description that undeniably sweeps in the proposed shareholder-arbitration bylaw.[2]

So how did Johnson & Johnson come up with this idea that the New Jersey Business Corporation Act somehow forbids corporations to adopt bylaws that extend beyond the corporation's "internal affairs"? The only textual argument that it makes relies on section 14A:2-9(5), which *allows* bylaws to include forum-selection clauses that require certain lawsuits to be brought in the courts of New Jersey:

> Without limiting subsection (4) of this section, the by-laws may provide that the federal and State courts in New Jersey shall be the sole and exclusive forum for:
>
> (i) any derivative action or proceeding brought on behalf of the corporation;
>
> (ii) any action by one or more shareholders asserting a claim of a breach of fiduciary duty owed by a director or officer, or former director or officer, to the corporation or its shareholders, or a breach of the certificate of incorporation or by-laws;
>
> (iii) any action brought by one or more shareholders asserting a claim against the corporation or its directors or officers, or former directors or officers, arising under the certificate of incorporation or the "New Jersey Business Corporation Act," N.J.S.14A:1-1 et seq.;

---

2. Johnson & Johnson quotes the Assembly "Committee Report" out of context. The Committee Report's statement about "internal affairs" was not even referring to section 14A:2-9(4); it was discussing section 14A:2-9(5), which authorizes bylaws to include forum-selection clauses. *See* ECF No. 1-6 at 9 ("The bill specifically allows the by-laws of a New Jersey corporation to contain exclusive forum clauses to provide that the federal and State courts in New Jersey are the sole and exclusive forum for disputes related to the 'internal affairs' of the corporation.").

(iv) any other State law claim, including a class action asserting a breach of a duty to disclose, or a similar claim, brought by one or more shareholders against the corporation, its directors or officers, or its former directors or officers; or

(v) any other claim brought by one or more shareholders which is governed by the internal affairs or an analogous doctrine.

N.J. Stat. Ann. § 14A:2-9(5)(a). Johnson & Johnson invokes the canon of *expressio unius est exclusio alterius* and argues that these are the *only* five circumstances in which a forum-selection bylaw is permitted under the New Jersey Business Corporation Act. *See* J&J Br. (ECF No. 25-1) at 19–20.

There are many problems with this argument. The most glaring problem is that the statute's introductory clause explicitly says that it is *not* limiting a corporation's power to enact bylaws under section 14A:2-9(4). *See* N.J. Stat. Ann. § 14A:2-9(5)(a) ("*Without limiting subsection (4) of this section*, the by-laws may provide that . . ." (emphasis added)). So section 14A:2-9(5)(a) may be construed only as a safe harbor for the forum-selection clauses described in subsections (i)–(v), not as an implied prohibition on other types of forum-selection clauses, agreements to arbitrate, or other types of corporate bylaws. The introductory clause forecloses any possible application of the *expressio unius* canon.[3]

---

3. The closest that Johnson & Johnson gets to addressing the introductory clause of section 14A:2-9(5)(a) is the following statement: "This argument does not assist Plaintiff because, as set forth above, Section 2-9(4) too limits the permissible scope of bylaws to internal affairs matters." J&J Br. (ECF No. 25-1) at 20 n.8. Not only is this a blatant mischaracterization of the scope of section 14A:2-9(4), as we make clear above, it fails to address the fact that the *expressio unius* canon is inapplicable when the statute explicitly disclaims any limitation on section 14A:2-9(4)'s authorization of corporate bylaws. Yet Johnson & Johnson continues to tout

Another problem is that section 14A:2-9(5)(a)(i) specifically allows forum-selection bylaws to govern "*any* derivative action or proceeding brought on behalf of the corporation." N.J. Stat. Ann. § 14A:2-9(5)(a) (emphasis added). "Any" derivative action includes derivative suits brought under the federal securities laws, which are commonplace.[4] Yet Johnson & Johnson claims that section 14A:2-9(5)(a) somehow precludes forum-selection bylaws for *all* federal securities claims—both derivative and non-derivative—even though section 14A:2-9(5)(a)(i) authorizes forum-selection bylaws for "*any* derivative action or proceeding brought on behalf of the corporation." Yet federal securities claims are no more "internal" to the corporation when brought as derivative actions, and we *know* from the text of section 14A:2-9(5)(a)(i) that derivative lawsuits based on federal securities claims may be subject to a forum-selection bylaw. So section 14A:2-9(5)(a)(i) only confirms that federal securities claims are appropriate for forum-selection bylaws. They are assuredly subject to forum-selection bylaws when brought as derivative lawsuits, and Johnson & Johnson makes no argument for why a different result should obtain for non-derivative federal securities claims.

---

the *expressio unius* canon—even though a court *cannot apply* that canon given the introductory clause of section 14A:2-9(5)(a). *See* J&J Br. (ECF No. 25-1) at 19–20.

4. *See, e.g.*, *Shaev v. Saper*, 320 F.3d 373, 375 (3d Cir. 2003) ("Datascope shareholder David Shaev brought a derivative lawsuit under the Federal Securities Exchange Act of 1934 . . ."); *Gen. Elec. Co. by Levit v. Cathcart*, 980 F.2d 927, 928 (3d Cir. 1992) ("J.H. Levit appeals in this shareholder derivative action from a district court order of March 30, 1992, dismissing his federal securities claims pursuant to Fed. R. Civ. P. 12(b)(6) . . .").

A third and final problem is that N.J. Stat. Ann. § 14A:2-9(5)(a) deals only with *forum-selection* clauses that compel litigation in the courts of New Jersey. It does not address the permissibility of *arbitration* requirements. So there is no basis for inferring limitations on the permissibility of arbitration bylaws from section 14A:2-9(5)(a)'s partial endorsement of forum-selection bylaws—even if one were to pretend that the *expressio unius* canon could somehow apply to this statute.

So Johnson & Johnson's attempt to manufacture a statutory prohibition on shareholder-arbitration bylaws is a flop. Section 14A:2-9(5)(a) serves only to *allow* forum-selection bylaws, and it cannot be interpreted to *preclude* arbitration bylaws when the statute specifically states that it does *not* limit the scope of section 14A:2-9(4). More importantly, section 14A:2-9(5)(a) reaffirms that forum-selection bylaws may govern "any" derivative action, which includes derivative actions brought under federal securities laws. So Johnson & Johnson remains stuck with the statutory language in sections 14A:3-1(1)(k) and 14A:2-9(4), and it must find some other way to show how it would *violate the law of New Jersey* by adopting the proposed bylaw.

### 2.    Johnson & Johnson Fails To Identify Any New Jersey Court Decision or Judicial Doctrine That Prohibits Corporations From Adopting Shareholder-Arbitration Bylaws

Johnson & Johnson fares no better in its efforts to derive a prohibition from New Jersey court decisions. It cites some cases regarding the "internal affairs" doctrine, but that is a choice-of-law rule that determines which State's law should regulate a corporation's "internal affairs." *See Edgar v. MITE Corp.*, 457 U.S. 624, 645 (1982) ("The internal affairs doctrine is a conflict of laws principle which recognizes that

only one State should have the authority to regulate a corporation's internal affairs . . . because otherwise a corporation could be faced with conflicting demands."); *Fagin v. Gilmartin,* 432 F.3d 276, 282 (3d Cir. 2005) ("Under New Jersey's choice-of-law rules, the law of the state of incorporation governs internal corporate affairs."). This doctrine has no relevance to whether Johnson & Johnson would violate the law of New Jersey if it adopted the Trust's proposal. The parties agree that New Jersey law—rather than some other State's law—governs Johnson & Johnson's "internal affairs"; the issue is whether New Jersey law *prohibits* Johnson & Johnson from adopting a shareholder-arbitration bylaw. To answer this question, Johnson & Johnson must explain how *New Jersey* statutes and *New Jersey* court rulings prohibit the proposed bylaw; it should not be obfuscating by citing cases and doctrines that have no bearing on this question. The observation that only one State's law may regulate a corporation's "internal affairs" does nothing to show that the law of New Jersey prohibits corporate bylaws that extend beyond those "internal affairs."

Johnson & Johnson cites only one court decision that says anything about the corporate law of New Jersey, and that is *Lambert v. Fishermen's Dock Co-op, Inc.*, 297 A.2d 566 (N.J. 1972). The plaintiff in *Lambert* had joined a fishermen's cooperative association in 1957 by purchasing two shares of its stock for $125. When the plaintiff joined, the bylaws provided that a stockholder would receive the "fair book value" of his shares upon termination of membership. In 1962, however, the bylaws were amended to give departing stockholders only the original price paid for the stock. When the plaintiff's membership was terminated in 1965, the corporation paid him

only $125 for his shares. The plaintiff sued and argued that the 1962 amendment to the bylaws was invalid. The state supreme court agreed:

> It is the law generally that a reserved right to amend the by-laws of an association . . . is a limited rather than an absolute right, even though the reservation is expressed in broad and general terms. It is often said that such *a right to amend* may not be extended so as to impair or destroy a contract or vested right, that it does not authorize the adoption of an amendment which will have such an effect, and that *in general the exercise of such a right* should be confined to matters touching the administrative policies and affairs of the corporation, the relations of members and officers with the corporation and among themselves, and like matters of internal concern.

*See Lambert*, 297 A.2d at 569–70 (emphasis added). Then the Court went on declare the amendment invalid because it affected the "basic rights" of stockholders:

> In New Jersey this rule, that a reserved power to amend by-laws may not affect basic rights, has found expression in a number of cases; interestingly, most of these deal with societies and associations which are similar to the defendant cooperative in that they were created to foster some kind of mutual benefit. . . . Elsewhere the general rule limiting the exercise of the reserved right to amend by-laws to such matters as will not substantially affect basic rights of stockholders or members has been applied to cooperatives like the defendant. . . . Accordingly we hold that the amended by-law adopted in 1962 by Fishermen's Dock Cooperative was ineffective to divest the plaintiff of the right given him under the by-law in effect when he purchased his stock, namely, to receive upon the termination of his membership, the fair book value of his shares.

*See id.* at 569–71.

Johnson & Johnson claims throughout its brief that *Lambert* established a categorical prohibition on bylaws that extend beyond "matters of internal concern,"[5] but

---

5.  *See* J&J Br. (ECF No. 25-1) at 4, 14, 16.

the case says no such thing. *Lambert* disapproved the amendment because it divested existing stockholders of their "basic rights," *not* because it attempted to regulate matters beyond the corporation's "internal affairs."

More importantly, *Lambert* makes clear that New Jersey law *permits* bylaws that touch upon "the relations of members . . . with the corporation and among themselves." *Lambert*, 297 A.2d at 569. And a shareholder lawsuit brought under the federal securities laws will *always* involve "the relations of members . . . with the corporation and among themselves." *Id.* A federal securities-law claim that arises out of the purchase or sale of the corporation's shares will be brought by someone who was wrongfully induced to purchase shares, and thus become a shareholder, or who was wrongfully induced to sell shares, and thus to cease to be a shareholder. Johnson & Johnson does not even attempt to deny that a shareholder-arbitration bylaw touches upon "the relations of members . . . with the corporation and among themselves," so it cannot argue that *Lambert* precludes it from adopting the proposed bylaw.

*Lambert* is the *only* case in Johnson & Johnson's brief that purports to interpret the corporate law of New Jersey, and *Lambert* comes nowhere close to establishing or even suggesting a prohibition on shareholder-arbitration bylaws. So Johnson & Johnson has *nothing* that can overcome the statutory language of sections 14A:3-1(1)(k) and 14A:2-9(4), which explicitly allow corporate bylaws to regulate *any* aspect of the corporation's "affairs" or "business"—as well as the "rights or power" of the corporation and its shareholders, directors, and officers.

### 3.   Nothing In The Law Of New Jersey Indicates That The Proposed Shareholder-Arbitration Bylaw Regulates "External" Rather Than "Internal" Matters

Even if one were to assume that some New Jersey statute or court decision prohibits a corporation from adopting bylaws that extend beyond its "internal affairs," the proposed shareholder-arbitration bylaw would remain lawful because there is *nothing* in the law of New Jersey that excludes the proposed bylaw from the realm of "internal" corporate affairs. The proposed bylaw governs disputes between a shareholder and the corporation—or between a shareholder and the corporation's directors and officers—arising out of a claim that the corporation or its directors or officers fraudulently induced the purchase or sale of the corporation's shares, and it moves those disputes into an arbitral forum. All of these disputes are "internal" to the corporation because they involve disputes between the corporation and its shareholders over the manner in which the aggrieved party became a shareholder (or ceased to be one). In other words, they are disputes between the corporation (or the board or the officers) and a shareholder qua shareholder.

Johnson & Johnson makes no attempt to demarcate or explain the distinction between "internal" and "external" corporate affairs—and (more importantly) it cites nothing in the law of New Jersey that describes the boundary between "internal" and "external" corporate matters. Its only argument for why the proposed bylaw governs "external" rather than "internal" corporate matters involves a case from the Delaware Court of Chancery—which is not the law of New Jersey and is not a "law" to which Johnson & Johnson "is subject." *See* J&J Br. (ECF No. 25-1) at 21 (citing *Sciabacucchi v. Salzberg*, 2018 WL 6719718 (Del. Ch. Dec. 19. 2018)).

Johnson & Johnson must show that the proposed bylaw "*would*, if implemented, cause the company to violate any state . . . law to which it *is subject*." 17 C.F.R. § 240.14a-8(i)(2) (emphasis added). Johnson & Johnson is not "subject" to *Sciabacucchi*—and it will not become subject to *Sciabacucchi* until a New Jersey court or legislature incorporates the holding of that case into New Jersey law.

Johnson & Johnson's remaining arguments draw on choice-of-law rulings, which have nothing to do with whether *the law of New Jersey* regards the proposed shareholder-arbitration bylaw as a regulation of "internal" or "external" corporate matters. *See* J&J Br. (ECF No. 25-1) at 21–22 (citing cases).

## II.   Johnson & Johnson Cannot Manufacture A Prohibition In New Jersey Law By Relying On The Delaware Chancery Court's Decision In *Sciabacucchi*

Johnson & Johnson spends a great deal of its brief discussing court rulings from Delaware—even though Johnson & Johnson is governed by New Jersey and not Delaware corporate law. *See* J&J Br. (ECF No. 25-1) at 22–28. Johnson & Johnson, however, insists that this Court should look to Delaware court rulings because *Sciabacucchi* is the only judicial precedent that even remotely supports Johnson & Johnson's attack on the legality of the proposed shareholder-arbitration bylaw. Johnson & Johnson's reliance on *Sciabacucchi* is unavailing for numerous reasons.

### A.   Johnson & Johnson, As A New Jersey Corporation, Is Not "Subject" To Delaware Statutes Or Judicial Decisions

Johnson & Johnson must show that the Trust's proposal "*would*, if implemented, cause the company to violate any state . . . law to which it *is* subject." 17 C.F.R. § 240.14a-8(i)(2) (emphasis added). Johnson & Johnson, however, is not

"subject" to Delaware corporate law because it is not incorporated in that state. Johnson & Johnson is subject *only* to the corporate law of New Jersey. *See Fagin,* 432 F.3d at 282 ("Under New Jersey's choice-of-law rules, the law of the state of incorporation governs internal corporate affairs.").

 Johnson & Johnson appears to acknowledge as much—and it never goes so far as to suggest that it is "subject" to *Sciabacucchi* or other pronouncements from the Delaware judiciary. Instead, Johnson & Johnson observes that New Jersey courts "look to" Delaware precedent. *See* J&J Br. (ECF No. 25-1) at 22. But New Jersey courts are not required to follow Delaware rulings; they merely *consider* Delaware precedent and follow those rulings when they find them to be "helpful."[6] Delaware decisions offer only "guidance" and "assistance" to New Jersey courts.[7] They do not impose legal obligations on New Jersey courts—which is evident from the many New Jersey court decisions that reject or decline to follow Delaware rulings on corporate-law matters.[8] And they certainly do not impose legal obligations on Johnson & Johnson.

---

6. *Balsamides v. Protameen Chemicals, Inc.*, 734 A.2d 721, 732 (N.J. 1999) ("In analyzing corporate law issues, we find Delaware law to be helpful."); *Lawson Mardon Wheaton v. Smith*, 734 A.2d 738, 746 (N.J. 1999) (same).

7. *Casey v. Brennan*, 780 A.2d 553, 567 (N.J. Super. 2001), aff'd, 801 A.2d 245 (N.J. 2002) ("When considering issues of first impression in New Jersey regarding corporate law, we frequently look to Delaware for guidance or assistance.").

8. *See, e.g.*, *Brown v. Brown*, 731 A.2d 1212, 1215 (N.J. Super. 1999) (declining to adopt Delaware's requirement that plaintiffs in derivative actions must be stockholders at time of the lawsuit); *Asarco Inc. v. Court*, 611 F. Supp. 468, 478 (D.N.J. 1985) (holding that New Jersey courts would not follow a Delaware Supreme Court ruling allowing shareholders within a class of stock to be vested with different voting rights); *In re Newark Watershed Conservation & Development Corp.*, 560 B.R. 129, 147 (Bankr. D.N.J. 2016) ("Delaware corporate law also provides a

If Johnson & Johnson is contending that New Jersey courts might adopt the holding of *Sciabacucchi* in the future, that fails to establish that the shareholder-arbitration proposal "*would*, if implemented, cause the company to violate any state . . . law to which it *is* subject." 17 C.F.R. § 240.14a-8(i)(2) (emphasis added). Johnson & Johnson must identify an *extant* legal obligation that it is *currently* subject to—and it must show that the company *will violate* that law if it implements the proposed bylaw. It cannot satisfy 17 C.F.R. § 240.14a-8(i)(2) by speculating about what New Jersey courts *might* do at some unknown point in the future.

Johnson & Johnson also suggests that the New Jersey legislature implicitly endorsed *Sciabacucchi* and other Delaware court decisions when it enacted N.J. Stat. Ann. § 14A:2-9(4), which tracks the language of section 109(b) of the Delaware General Corporation Law. *See* J&J Br. (ECF No. 25-1) at 23. Johnson & Johnson also claims that N.J. Stat. Ann. § 14A:2-9(5) was "derived" from the Delaware Chancery Court's decision in *Boilermakers Local 154 Ret. Fund v. Chevron Corp.*, 73 A.3d 934, 943 (Del. Ch. 2013). *See* J&J Br. (ECF No. 25-1) at 23. According to Johnson & Johnson, the "Delaware judicial decisions existing at the time these sections were enacted

---

stronger safe harbor for directors (and trustees) under its Business Judgment Rule than does New Jersey law."); *id.* (noting that *Francis v. United Jersey Bank*, 432 A.2d 814 (N.J. 1981), "established a much higher standard for a director (or trustee) to avoid liability for actions of the corporate officers undertaken under their watch" than the standard in Delaware); *NCP Litigation Trust v. KPMG*, 945 A.2d 132, 140–43 (N.J. Super. 2007) (rejecting *Trenwick America Litigation Trust v. Ernst & Young, L.L.P.,* 906 A.2d 168, 174 (Del. Ch. 2006), and holding that "deepening insolvency" is a cognizable form of corporate harm).

thus are critical to understanding legislative intent, and New Jersey courts would conclude that they are bound by those decisions." *Id.*

There are many problems with this argument. The first problem is that the New Jersey legislature enacted sections 14A:2-9(4) and 14A:2-9(5) eleven months *before* the Delaware Chancery Court decided *Sciabacucchi*.[9] So if Johnson & Johnson wants to contend the New Jersey legislature tacitly incorporated the Delaware case law that existed on January 16, 2018, then it will have to forfeit its reliance on *Sciabacucchi*.

The second problem is that New Jersey courts have *never* regarded themselves as legally obligated to follow Delaware precedent,[10] and the New Jersey legislature enacted sections 14A:2-9(4) and 14A:2-9(5) against that backdrop. That means that the legislature's silence on the issue of Delaware precedent—and its refusal to codify the relevant Delaware court rulings—leaves the New Jersey judiciary free to decide whether (and to what extent) it will follow the decisions of Delaware courts. It does not evince an "intent" to compel the New Jersey courts to march in lockstep with their Delaware counterparts.

The third problem is that legislative "intentions"—whether actual or imagined—do not create legal obligations. *See Epic Systems Corp. v. Lewis*, 138 S. Ct. 1612, 1631 (2018) ("[W]e do not inquire what the legislature meant; we ask only what the

---

9. The New Jersey legislature enacted N.J. Stat. Ann. §§ 14A:2-9(4) and 14A:2-9(5) on January 16, 2018. *See* P.L. 2017, ch. 356, A.2162. The Delaware Chancery Court issued its ruling in *Sciabacucchi* on December 19, 2018. *See Sciabacucchi v. Salzberg*, 2018 WL 6719718 (Del. Ch. Dec. 19. 2018).

10. *See* note 8 and accompanying text.

statute means." (citations and internal quotation marks omitted)). Johnson & Johnson must show that it would violate an *actual provision* of New Jersey law by adopting the proposed bylaw; it cannot make this showing by ruminating about "legislative intent" or speculating about what future New Jersey court decisions might say.

### B. Nothing In Delaware Law Would Prevent Johnson & Johnson From Adopting The Proposed Shareholder-Arbitration Bylaw

Even if one were to pretend that the law of Delaware is the law of New Jersey, or even if one were to imagine that New Jersey had enacted a law that incorporated by reference the decisions of Delaware courts, Johnson & Johnson would still lose because there is no ruling from any Delaware court that forbids the proposed shareholder-arbitration bylaw.

Johnson & Johnson touts the Delaware Chancery Court's ruling in *Boilermakers Local 154 Retirement Fund v. Chevron Corp.*, 73 A.3d 934 (Del. Ch. 2013), but that case *upheld* a forum-selection bylaw that required the following claims to be litigated in Delaware state or federal courts:

> (i) any derivative action or proceeding brought on behalf of the Corporation,
>
> (ii) any action asserting a claim of breach of a fiduciary duty owed by any director, officer or other employee of the Corporation to the Corporation or the Corporation's stockholders,
>
> (iii) any action asserting a claim arising pursuant to any provision of the Delaware General Corporation Law, or
>
> (iv) any action asserting a claim governed by the internal affairs doctrine.

*Id.* at 942 (emphasis removed). *Boilermakers* enforced this forum-selection bylaw after concluding that it addressed "internal affairs claims," *id.* at 951, while suggesting in dictum that the result would be different if a forum-selection bylaw attempted to regulate "external matters":

> By contrast, the bylaws would be regulating external matters if the board adopted a bylaw that purported to bind a plaintiff, even a stockholder plaintiff, who sought to bring a tort claim against the company based on a personal injury she suffered that occurred on the company's premises or a contract claim based on a commercial contract with the corporation. The reason why those kinds of bylaws would be beyond the statutory language of 8 *Del. C.* § 109(b) is obvious: the bylaws would not deal with the rights and powers of the plaintiff-stockholder *as a stockholder*.

*Id.* at 952.

Nothing in *Boilermakers* suggests or implies that a forum-selection bylaw for federal securities-law claims would regulate "external matters" rather than "internal affairs." Quite the opposite: *Boilermakers* approved a forum-selection bylaw that extended to "*any* derivative action or proceeding brought on behalf of the Corporation"—which includes derivative actions brought under the federal securities laws. *See* note 4 and accompanying text. And *Boilermakers*'s examples of "external" claims brought by shareholders were tort or contract disputes that had nothing to do with the litigant's status as a shareholder. This does not in any way suggest that a shareholder's claim under the federal securities laws in connection with the purchase or sale of the corporation's shares, which plainly is tied to the claimant's status as a shareholder, falls into the "external affairs" category.

Johnson & Johnson also acknowledges the Delaware Supreme Court's ruling in *ATP Tour, Inc. v. Deutscher Tennis Bund*, 91 A.3d 554 (Del. 2014), which *approved* fee-shifting bylaws that compelled shareholders who bring unsuccessful claims against the corporation to pay the corporation's attorneys' fees. *See ATP Tour*, 91 A.3d at 558 ("A fee-shifting bylaw, like the one described in the first certified question, is facially valid."). *ATP Tour* limited its approval of fee-shifting bylaws to shareholder claims involving "intra-corporate litigation," *id.* at 558, and it recognized that fee-shifting bylaws will be unenforceable if "adopted for an improper purpose," *id.* at 560. But *ATP Tour* makes clear that corporate bylaws may regulate *all* "intra-corporate" litigation, and it is hard to imagine litigation that is more "intra-corporate" than a shareholder's lawsuit against the corporation (or against its directors and officers) over their alleged violations of the federal securities laws in connection with the purchase or sale of the corporation's shares that either created or terminated the relationship between the corporation and the aggrieved party qua shareholder. The plaintiffs in *ATP Tour* had brought their claims under the federal antitrust laws, and nothing in the Court's opinion denies that the shareholders' antitrust claims are "intra-corporate," nor does anything in the Court's opinion suggest or imply that fee-shifting bylaws would be unenforceable against claims created by federal law.[11]

---

11. The context in which the federal district court, at the direction of the Third Circuit, certified questions of Delaware law to the Delaware Supreme Court further confirms that "intra-corporate" is *not* limited to claims governed by Delaware law. The defendant corporation won at trial over a claim that its operations (managing the ATP tennis tour among its member tournament sponsors) violated federal antitrust law. The corporation then moved for attorneys' fees and other costs of lit-

Then there is *Sciabucucchi*, which refused to enforce a forum-selection clause in a certificate of incorporation that would have required shareholders to litigate their federal securities-law claims in federal court. *Sciabucucchi* reached this conclusion for two reasons. First, *Sciabucucchi* held that bylaws and certificates of incorporation may regulate only the corporation's "internal affairs,"[12] and that forum-selection clauses in these documents may govern only "intra-corporate litigation" or "internal corporate claims" rather than "external" claims.[13] Second, *Sciabucucchi* held that

---

igation under the fee-shifting bylaw. The district court refused to enforce the bylaw on the ground that it was preempted by federal antitrust law. The Third Circuit reversed and instructed the district court to certify the validity of the fee-shifting bylaw to the Delaware Supreme Court, because if the bylaw were found invalid as a matter of state law, the need to reach the federal preemption argument would become unnecessary. The Delaware Supreme Court focused on the "facial" validity of the bylaw because it did not want to address factual questions such as the purpose behind the bylaw's adoption or the substantive fairness of the specific bylaw in question. *See ATP Tour, Inc. v. Deutscher Tennis Bund*, 91 A.3d 554, 558 (Del. 2014) ("Whether the specific ATP fee-shifting bylaw is enforceable, however, depends on the manner in which it was adopted and the circumstances under which it was invoked."); *id*. at 559 ("[T]he enforceability of a facially valid bylaw may turn on the circumstances surrounding its adoption and use."). But it defies logic (and prudent use of judicial resources) to interpret that finding of facial validity to be unrelated to the federal antitrust claim that gave rise to the certified questions.

12. *Sciabucucchi*, 2018 WL 6719718, at *1 ("[T]he Delaware General Corporation Law . . . authorizes the bylaws to regulate 'internal affairs claims brought by stockholders *qua* stockholders.' . . . Section 109(b) does *not* authorize a Delaware corporation to regulate external relationships.").

13. *Id*. at *18 ("[A] Delaware corporation does not have the power to adopt in its charter or bylaws a forum-selection provision that governs external claims.").

federal securities-law claims are "external" claims rather than "intra-corporate litigation" or "internal corporate claims,"[14] and therefore cannot be controlled by a forum-selection clause in a certificate of incorporation.

*Sciabacucchi* is readily distinguishable from this case. *Sciabacucchi* disapproved a *forum-selection* charter provision that required shareholder claims under the Securities Act to be brought in federal court. The Trust, by contrast, wants to require *arbitration* of these federal securities-law claims. This distinction is crucially important because an arbitration agreement (unlike a forum-selection clause) is protected by the Federal Arbitration Act—and the FAA will preempt state laws or judicial rulings that prevent the enforcement of arbitration contracts. *See AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 341 (2011). So it is not at all apparent that *Sciabacucchi*'s unwillingness to enforce a forum-selection clause in a certificate of incorporation will carry over to arbitration, because a court would first need to address whether Delaware is even *permitted* to refuse enforcement of these arbitration requirements. Johnson & Johnson simply assumes that Delaware courts would treat the two situations alike and would ignore the preemptive effects of the FAA.

Johnson & Johnson's only response is to deny that the FAA will preempt a state-court ruling that extends *Sciabacucchi* to arbitration bylaws. *See* J&J Br. (ECF No. 25-1) at 28–33. As we make clear in Part III of this brief, Johnson & Johnson is as wrong about preemption as it is about denying that a claim by a shareholder against a corporation for falsely inducing it to become a shareholder (or to cease to be one) is not

---

14. *Id.* at *22 ("[A] federal claim under the 1933 Act is a clear example of an external claim.").

intra-corporate in nature and thus well within the permitted scope of a charter or bylaw provision. But at a minimum the Delaware courts could be expected to be chary about inviting a constitutional preemption challenge by extending Sciabacucchi to prohibit shareholder—arbitration bylaws. *See Sciabacucchi*, 2018 WL 6719718, at *12 & n.77 (observing that state law may be interpreted "to avoid the constitutional question of preemption" (citation omitted)). And regardless of what the Delaware judiciary *might* decide to do in this regard, the fact remains that no court in Delaware has *ever* issued a ruling that forbids corporations to adopt arbitration bylaws. *Sciabacucchi*'s disapproval of a forum-selection charter provision does not show that Delaware forbids *arbitration* bylaws for federal securities-law claims.

   More importantly, *Sciabacucchi* is flatly incompatible with the Delaware Supreme Court's pronouncement in *ATP Tour*, which held clearly and unequivocally that corporate bylaws may regulate "intra-corporate litigation." *See ATP Tour*, 91 A.3d at 558. A lawsuit by a shareholder qua shareholder against the corporation (or against its directors and officers) is by definition "intra-corporate," and an arbitration bylaw is as permissible as a fee-shifting bylaw in these intra-corporate lawsuits. Unless Johnson & Johnson is prepared to deny that such shareholder lawsuits are "intra-corporate"—and we cannot fathom an argument that they are not, as lawsuits between the shareholders and the corporation are the very definition of "intra-corporate" litigation—then it cannot escape the conclusion that *Sciabacucchi*'s holding contradicts *ATP Tour*, and *ATP Tour* must prevail as the pronouncement of the state's highest court. *Sciabacucchi* is on appeal to the Delaware Supreme Court and

it could be reversed on these very grounds, which makes Johnson & Johnson's attempt to transport *Sciabacucchi* into the law of New Jersey even more dubious.

## III. The Federal Arbitration Act Will Preempt Any State Law That Prevents Courts From Enforcing The Proposed Shareholder-Arbitration Bylaw

A more serious problem for Johnson & Johnson is that the Federal Arbitration Act will preempt any state law that prohibits the enforcement of shareholder-arbitration bylaws. So even if one were to imagine that New Jersey had enacted a statute that: (1) incorporated *Sciabacucchi*'s holding as the law of New Jersey, and (2) extended *Sciabacucchi*'s holding to arbitration bylaws, Johnson & Johnson would *still* lose because this hypothetical law would be preempted by the FAA.

The FAA provides:

> A written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. The Supreme Court has repeatedly held that the FAA reflects a strong legislative policy in favor of arbitration, and it has repeatedly held that the FAA preempts state laws restricting arbitration. *See Concepcion*, 563 U.S. at 339 ("We have described this provision as reflecting both a 'liberal federal policy favoring arbitration'. . . and the 'fundamental principle that arbitration is a matter of contract'[.]") (citation omitted); *Moses H. Cone Hosp. v. Mercury Const. Corp.* 460 U.S. 1, 24 (1983).

Johnson & Johnson tries to escape the FAA by denying that a corporation's by-laws qualify as a "contract," but that stance is irreconcilable with the cases cited in our earlier brief, which make abundantly clear that corporate bylaws establish a legally binding "contract" between the corporation and its shareholders.[15] *See* Paul Weitzel, *The End of Shareholder Litigation: Using Bylaw or Charter Amendments to Require Binding Arbitration of Shareholder Disputes*, 2013 BYU L. Rev. 65, 97 ("Every state to address the issue has held that bylaws and charters are contracts binding upon shareholders . . . . The major treatises are also unanimous."). Johnson & Johnson acknowledges this authority but cautions that one should not "assume" that corporate bylaws qualify as "contracts" within the meaning of the FAA. *See* J&J Br. (ECF No. 25-1) at 30. But anything that qualifies as a "contract" under state law is by definition a "contract" under the FAA. *See Blair v. Scott Specialty Gases*, 283 F.3d 595, 603 (3d Cir. 2002) ("A federal court must generally look to the relevant state law on the formation of contracts to determine whether there is a valid arbitration agreement under the FAA."). There is no such thing as a "contract" that is not a

---

15. *See Vergopia v. Shaker*, 922 A.2d 1238, 1249 (N.J. 2007) ("[T]he certificate of incorporation, constitution and bylaws of the corporation constitute *a contract* between the corporation and its stockholders and the stockholders *inter sese*" (citation omitted)); *Rosenberg v. AT&T Employees Federal Credit Union*, 726 F. Supp. 573, 578 (D.N.J. 1989) ("It is well settled under common law that bylaws generally act as a contract between a corporation and its shareholders."); *Airgas, Inc. v. Air Prods. and Chems., Inc.,* 8 A.3d 1182, 1188 (Del. 2010) ("Corporate charters and bylaws are contracts among the corporation's shareholders"); *Centaur Partners, IV v. Nat'l Intergroup, Inc.*, 582 A.2d 923, 928 (Del. 1990) ("Corporate charters and by-laws are contracts among the shareholders of a corporation and the general rules of contract interpretation are held to apply.").

"contract" for FAA purposes. *See Concepcion*, 563 U.S. at 339 ("[C]ourts must place arbitration agreements on an equal footing with other contracts"). If corporate by-laws are "contracts"—and the law of New Jersey unequivocally holds that they are—then any "written provision" to settle claims by arbitration in those contracts is "valid, irrevocable, and enforceable" under the terms of the FAA. *See Delaware County Employees Retirement Fund v. Portnoy*, No. 13-10405-DJC, 2014 WL 1271528 (D. Mass. Mar. 26, 2014) (enforcing shareholder-arbitration bylaw as a "contract" within the meaning of the FAA); *Corvex Management LP v. CommonWealth REIT*, No. 24-C-13-001111, 2013 WL 1915769 (Cir. Ct. Balt. City May 8, 2013) (same).[16] Johnson & Johnson cannot credibly argue that provisions covering "external" claims, including arbitration, are not contracts because "external" claims are not proper subjects for bylaws. Bylaws *are* contracts. It stretches credulity to argue that a bylaw covering an internal claim, e.g., arbitration of a fiduciary-duty claim, is a con-tract but a bylaw covering an external claim, a federal-based securities claim, is not.

Johnson & Johnson next argues that the FAA cannot be used to enforce a share-holder-arbitration bylaw if that bylaw would be unenforceable under state law, claim-ing that there would be "no mutual assent" in those situations. *See* J&J Br. (ECF No. 25-1) at 29. But the FAA is concerned only with whether a "contract" exists. If

---

16. The CalPERS amicus brief invokes *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156 (3d Cir. 2009), but that case is inapplicable because it describes the law of Pennsylvania rather than New Jersey, and in all events its interpretation of Pennsylvania law would be preempted by the FAA. We incorporate by reference our previous discussion of these issues. *See* Br. in Support of Pl.'s Mot. for Order to Show Cause (ECF No. 8) at 28–33.

there is a "contract," then any "written provision" to arbitrate in that contract *must* be enforced, subject only to "grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. And it is undeniable that the corporate bylaws qualify as a "contract" because other provisions in the bylaws (such as those governing sale or liquidation of the company) remain binding on shareholders—even though these provisions have no more "mutual assent" than an arbitration provision would have.

Johnson & Johnson tries to invoke the FAA's savings clause and suggests that New Jersey has established "grounds . . . at law or in equity for the revocation of any contract." *See* J&J Br. (ECF No. 25-1) at 31–33. But nothing in Johnson & Johnson's description of New Jersey law is a ground for *the revocation of any contract. See, e.g., Concepcion*, 563 U.S. at 339 ("This saving clause permits agreements to arbitrate to be invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability'"). A law that prohibits bylaws from covering federal securities-law claims, on the ground these claims are 'external' to the corporation, is not a "ground . . . for the revocation of *any* contract" because it applies only to a *subset* of contracts in New Jersey, nor is it a "generally applicable contract defense."

Johnson & Johnson also suggests that the proposed bylaw cannot be covered by the FAA because securities-law disputes do not "arise out of" a corporation's by-laws. *See* J&J's Br. at 30–31. This argument is meritless. The FAA requires courts to enforce agreements to arbitrate any controversy arising out of any "transaction" that is evidenced by the contract or bylaw. *See* 9 U.S.C. § 2 ("A written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to

perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."). In this instance, the predicate "transaction" is the purchase or sale of the corporation's shares that is claimed to have been fraudulently induced, and the bylaws are the "contract" that governs the relationship between the corporation and its shareholders that is created on purchase and terminated on sale of the securities. The FAA does not require the controversy to arise out of the actual contract that includes the agreement to arbitrate.

Johnson & Johnson's main argument is that the FAA may preempt only state laws that discriminate against arbitration. *See* J&J Br. (ECF No. 25-1) at 31–33 ("The FAA 'preempts any state rule discriminating on its face against arbitration—for example, a "law prohibit[ing] outright the arbitration of a particular type of claim."'" (quoting *Kindred Nursing Centers Limited Partnership v. Clark*, 137 S. Ct. 1421, 1426 (2017) (citation omitted)). But this quote from *Kindred* is preceded by a more general formulation. *See Kindred,* 137 S. Ct. at 1426 ("A court may invalidate an arbitration agreement based on 'generally applicable contract defenses like fraud or unconscionability but not on legal rules that that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue.'" (quoting *Concepcion*, 563 U.S. at 339). This more general proposition, based on the actual language of the FAA, makes clear that the *only* basis for invalidating an arbitration contract is a general contract defense. The arbitration provisions in neither *Kindred* nor *AT&T*

*Mobility* met this test.  Nowhere has the Supreme Court said, nor does the FAA provide, that a prohibition of an arbitration contract is permissible as long as a wider set of contracts, e.g., all bylaw contracts involving "external" claims, are also banned. In *Concepcion*, the Supreme Court invalidated a California rule that prohibited class arbitration based on a more general policy favoring class-based resolution of disputes. It was of no avail to plaintiffs that the prohibition of anti-class dispute resolution was cast more broadly than just arbitration—it extended to all forms of litigation. So here the ban on bylaw arbitration of federal securities claims cannot be saved by the fact that this ban is part of a more general ban of bylaws covering "external" claims.

It would be a far different matter, perhaps, if a state were to ban use of bylaws to resolve disputes between shareholders and corporations that had nothing to do with the relationship between shareholders qua shareholders and corporations--such as consumer complaints.  In that instance, arbitration could still be effected, as it is normally done today, through bilateral contracts. But more significantly, a state law that forbids bylaws to regulate federal securities-law claims between shareholders and management will make it impossible to establish arbitration contracts for federal securities-law claims. The only effective way for a publicly traded company to establish an agreement to arbitrate federal securities-law claims is through the corporate charter or bylaws, and if state law makes the charter and bylaws unavailable for this purpose then the state has effectively prohibited arbitration of these claims. So even a facially neutral state law would be preempted if it prevents courts from enforcing bylaws (or charter provisions) that require arbitration of federal securities-law

claims, because it would make it impossible for public corporations to establish effective agreements to arbitrate those claims. *See Concepcion*, 563 U.S. at 341–352.

## IV.   THE STATE ATTORNEY GENERAL'S EDICTS ARE NOT ENTITLED TO DEFERENCE

Johnson & Johnson begins its discussion of state law not by citing a New Jersey statute or court decision, but by asking the Court to "respect" and "follow" the state Attorney General's pronouncements. *See* J&J Br. (ECF No. 25-1) at 13. The Attorney General's views on this matter are not entitled to any weight, and even if they were they cannot change the fact that there is *nothing* in New Jersey law that prohibits corporations from adopting shareholder-arbitration bylaws.

The New Jersey Business Corporation Act is administered not by the Attorney General, but by the Division of Taxation in the Department of the Treasury, and the Director of the Division—not the Attorney General—is empowered to issue regulations and guidance on the meaning of the Act. *See* N.J. Rev. Stat. 14A:13-22 ("The Director, Division of Taxation in the Department of Treasury shall administer the provisions of this act, adopt regulations necessary or desirable to effectuate its purposes, prepare instructions for guidance and information and provide for all other matters reasonably required for the fair, impartial and practical administration of this act."). The New Jersey judiciary defers only to the Director's interpretations of the Act, not to the views of the Attorney General. *See Metromedia, Inc. v. Dir., Div. of Taxation*, 478 A.2d 742, 749 (N.J. 1984) ("[T]he Director's expertise, particularly when exercised in the specialized and complex area covered by these provisions of

the Act, is entitled to great respect by the courts."); *see also New Jersey Guild of Hearing Aid Dispensers v. Long*, 384 A.2d 795, 810 (N.J. 1978) ("[T]he construction of a regulatory statute of the expert administrative agency *charged with the enforcement of that statute* is entitled to great weight and is a 'substantial factor to be considered in construing the statute.'" (emphasis added) (citation omitted)).

More importantly, the state attorney general has no power to enforce the relevant portions of the New Jersey Business Corporation Act. That is because there are no penalties and no liability imposed on corporations that adopt legally unenforceable bylaws. The Attorney General observes that *other* provisions in the New Jersey Business Corporation Act empower the Attorney General to pursue penalties against non-compliant corporations, *see* AG's Br. (ECF No. 35-4 at 19 n.2), but that only reinforces the absence of such enforcement mechanisms with respect to N.J. Stat. Ann. § 14A:3-1(1)(k) or N.J. Stat. Ann. § 14A:2-9(4). The only entity that can police the content of corporate bylaws is the state judiciary, by declining to enforce a bylaw that is inconsistent with N.J. Stat. Ann. § 14A:3-1(1)(k) or § 14A:2-9(4).

The Supreme Court has also made clear that federal courts are not to give controlling weight to the views of a state attorney general. *See Stenberg v. Carhart*, 530 U.S. 914, 940 (2000) ("This Court's case law makes clear that we are not to give the Attorney General's interpretative views controlling weight."). That is especially true when the state attorney general's views do not bind the state judiciary. *See id.* ("[O]ur precedent warns against accepting as 'authoritative' an Attorney General's interpretation of state law when the Attorney General does not bind the state courts

or local law enforcement authorities." (citation omitted)). The Supreme Court refused to give *any* weight to the state attorney general's interpretation of the partial-birth abortion statute in *Stenberg*, and no different result should obtain when the Department of the Treasury and not the Attorney General is charged with enforcing and interpreting the relevant provisions of the New Jersey Business Corporation Act.

Finally, an opinion from the Attorney General cannot overcome the language of the New Jersey Business Corporation Act, which contains no fewer than *four* provisions that authorize the proposed shareholder-arbitration bylaw. *See* Part I.A, *supra*; *Stenberg*, 530 U.S. at 942 (refusing to accept a state attorney general's interpretation that "conflicts with the statutory language"). The Attorney General—like Johnson & Johnson—is attempting to rewrite the relevant provisions in the name of interpretation. But the statutory text bears repeating:

- Section 14A:3-1(1)(k) authorizes bylaws "for the administration and regulation of the affairs of the corporation."

- Section 14A:2-9(4) authorizes bylaws "relating to the business of the corporation."

- Section 14A:2-9(4) authorizes bylaws "relating to . . . the conduct of [the corporation's] affairs."

- Section 14A:2-9(4) authorizes bylaws "relating to . . . [the corporation's] rights or power or the rights or power of its shareholders, directors, officers or employees."

The language of *each* of these provisions unambiguously authorizes the proposed arbitration bylaw, and no opinion from the state attorney general can change what these statutes say. *See New Jersey Guild of Hearing Aid Dispensers v. Long*, 384 A.2d

795, 810 (N.J. 1978) ("[C]ourts remain the 'final authorities' on issues of statutory construction and are not obliged to 'rubber stamp' their approval of the administrative interpretation." (citations omitted)); *Mayflower Sec. Co. v. Bureau of Sec. in Div. of Consumer Affairs of Dep't of Law & Pub. Safety*, 312 A.2d 497, 501 (N.J. 1973) ("An appellate tribunal is, however, in no way bound by the agency's interpretation of a statute or its determination of a strictly legal issue.").

## V.   THE TRUST'S PROPOSAL WILL NOT CAUSE JOHNSON & JOHNSON TO VIOLATE FEDERAL LAW

Section 29(a) of the Securities Exchange Act provides:

> Any condition, stipulation, or provision binding any person to *waive compliance with* any provision of this title or of any rule or regulation thereunder, or of any rule of a self-regulatory organization, shall be void.

15 U.S.C. § 78cc(a) (emphasis added). Johnson & Johnson asserts that the Trust's proposal would "cause" Johnson & Johnson to "violate" this statutory provision.

An agreement to arbitrate federal securities-law claims does not *waive compliance with* the securities laws. *See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628 (1985) ("By agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum."). Johnson & Johnson, however, invokes *Shearson/American Express Inc. v. McMahon*, 482 U.S. 220 (1987), and claims that courts may enforce an agreement to arbitrate securities-law claims only when the arbitration procedures are subject to SEC oversight. *See* J&J Br. at 35–36.

This argument was soundly refuted in our previous briefing. *See* Br. in Support of Pl.'s Mot. for Order to Show Cause (ECF No. 8) at 12–13. *McMahon* enforced an

agreement to arbitrate federal securities-law claims, but limited its holding to arbitration procedures established by entities within the SEC's regulatory jurisdiction.[17] *McMahon* limited its holding in this manner because an earlier ruling of the Supreme Court, *Wilko v. Swan*, 346 U.S. 427 (1953), had refused to enforce an agreement to arbitrate claims arising under the federal securities laws. Rather than overruling *Wilko*, *McMahon* distinguished it on the ground that the arbitration procedures in *McMahon* had been specifically approved by the SEC,[18] while the arbitration procedures in *Wilko* were not subject to SEC oversight.[19] Now that the Supreme Court has overruled *Wilko*,[20] it no longer matters whether an agreement to arbitrate requires procedures that are subject to SEC oversight; federal courts must enforce the agreement regardless under the terms of the FAA. *See Epic Systems Corp. v. Lewis*, 138 S. Ct. 1612, 1627 (2018) (enforcing an arbitration agreement without regard to whether the arbitration procedures are subject to agency oversight).

---

17. *See Shearson/American Express Inc. v. McMahon*, 482 U.S. 220, 234 (1987) ("We conclude that where, as in this case, the prescribed [arbitration] procedures are subject to the [SEC's] § 19 authority, an arbitration agreement does not effect a waiver of the protections of the Act.").

18. *See McMahon*, 482 U.S. at 234 ("[T]he SEC has specifically approved the arbitration procedures of the New York Stock Exchange, the American Stock Exchange, and the NASD, the organizations mentioned in the arbitration agreement at issue in this case.").

19. *See McMahon*, 482 U.S. at 233 ("Even if *Wilko'* s assumptions regarding arbitration were valid at the time *Wilko* was decided, most certainly they do not hold true today for arbitration procedures subject to the SEC's oversight authority.").

20. *See Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477 (1989). *See id.* at 484 ("*Wilko* was incorrectly decided and is inconsistent with the prevailing uniform construction of other federal statutes governing arbitration agreements in the setting of business transactions.").

Johnson & Johnson also contends that it would "violate" federal law if it adopted a bylaw that waives a shareholder's right to seek judicial vacatur of an arbitration award. *See* J&J Br. at 36–37. But nothing in the Federal Arbitration Act purports to prevent parties to a contract from waiving their rights to seek judicial vacatur under 9 U.S.C. § 10, and even constitutional rights to judicial review can be waived in exchange for something that is valued more highly. *See, e.g.*, Frank H. Easterbrook, *Plea Bargaining as Compromise*, 101 Yale L.J. 1969 (1992). A single decision from the Ninth Circuit that refused to enforce a waiver of 9 U.S.C. § 10 does not establish that Johnson & Johnson would "violate" the law by adopting the Trust's proposal, as rulings from the Ninth Circuit have no legal effect in New Jersey. And in all events, *In re Wal-Mart Wage & Hour Employment Practices Litigation*, 737 F.3d 1262, 1268 (9th Cir. 2013), at most shows that federal law might render the waiver of judicial review unenforceable; that does not show that Johnson & Johnson would *violate federal law* by adding the proposal to its bylaws, even if a portion of the proposed bylaw turns out to be unenforceable in court. One does not "violate" the law by adopting a corporate bylaw that includes a judicially unenforceable provision.[21] The consequence is simply that courts will decline to enforce the prohibition on judicial review; neither federal law nor the law of New Jersey will impose penalties or liability upon corporations that adopt such a bylaw.

---

21. Federal law—like the law of New Jersey—does not prohibit the act of entering into a legally unenforceable contract, and it does not prohibit the act of adopting a legally unenforceable corporate bylaw. Nor does federal law impose penalties or liability upon corporations that adopt bylaws that turn out to be unenforceable in court.

## VI.   The Trust Has Standing

The trust owns the shares of Johnson & Johnson, which makes it the real party in interest and the proper plaintiff under the rules of civil procedure. *See* Fed. R. Civ. P. 17(a) ("An action must be prosecuted in the name of the real party in interest."). Johnson & Johnson denies that the trust is the real party in interest, but it never identifies who the real party in interest might be, nor does it explain how some other person or entity could qualify as the real party in interest when the trust owns the shares in the company.

Johnson & Johnson also contends that the trust lacks capacity to sue in its own name, but the trust's capacity to sue is determined "by the law of the state where the court is located." Fed. R. Civ. P. 17(b)(3). Johnson & Johnson's reliance on Massachusetts cases is irrelevant to this question, and it cites nothing from New Jersey that rejects the trust's capacity to sue. Finally, even if Johnson & Johnson could show that the trust is an improper plaintiff, that is not a basis for dismissal. *See* Fed. R. Civ. P. 17(c) ("The court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action.").

## CONCLUSION

The motion to dismiss should be denied.

Respectfully submitted.

JONATHAN F. MITCHELL *
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

 /s/ Walter S. Zimolong 
WALTER S. ZIMOLONG
Zimolong LLC
P.O. Box 552
Villanova, PA 19085
(215) 665-0842
wally@zimolonglaw.com

HAL S. SCOTT*
Harvard Law School
1557 Massachusetts Avenue
Cambridge, Massachusetts 02138
(617) 495-4590
hscott@law.harvard.edu

*  admitted *pro hac vice*

Dated: July 8, 2019                              *Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I certify that on July 8, 2019, I served this document by CM/ECF upon:

Andrew Muscato
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, New York 10036
(212) 735-3000 (phone)
(212) 735-2000 (fax)
andrew.muscato@skadden.com

*Counsel for the Defendant*

 /s/ Walter S. Zimolong
Walter S. Zimolong
*Counsel for Plaintiff*